| | | |
|---|---|---|
| **NORMA NICELY** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Case No.:** |
| | ) | |
| **PLIVA, INC.** | ) | |
| | ) | |
| **BARR PHARMACEUTICALS INC.** | ) | |
| **A/K/A** | ) | |
| **BARR PHARMACEUTICALS LLC** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## INTRODUCTION

1.     This is a pharmaceutical tort action brought on behalf of the above named Plaintiff, Norma Nicely arising out of the negligence, negligent misrepresentation and breach of warranty of the Defendants in their manufacture, promotion, distribution, sale and/or provision of incomplete, inaccurate information related to Reglan, Metoclopramide and/or Metoclopramide HCl.  As a result, Plaintiff suffered permanent injuries and significant pain and suffering, emotional distress, lost wages and earning capacity, and diminished quality of life.  The Plaintiff respectfully seeks all damages to which she may be legally entitled.

2.     Plaintiff is re-filing this action pursuant to KRS 413.270 and/or § 516.230 R.S.Mo. 1986, after Defendants renewed a challenge to personal jurisdiction in St. Louis County (Missouri) four years into litigation, and Hon. Richard C. Bresnahan dismissed Plaintiff's case without prejudice.  That case is still pending in St. Louis County (Missouri) against another Defendant and this Complaint relates back to that case.

## PARTIES

3.     Plaintiff Norma Nicely ("Ms. Nicely") resides in the city of Brodhead, Rockcastle County, Kentucky.

4.     Ms. Nicely identified supra, inclusive, and may be referred to in this Complaint, as the "Plaintiff."

5.     Defendant **PLIVA, INC.** is a New York corporation with its principal place of business in New Jersey, and is a subsidiary or division of Pliva. d.d., a corporation organized, existing, and doing business under and by virtue of the laws of the Republic of Croatia, headquartered in Zagreb, Croatia, and regularly conducts business in Kentucky.

6.     **PLIVA, INC.** is a wholly-owned subsidiary of Pliva, d.d., which is a wholly-owned subsidiary of **BARR PHARMACEUTICALS, INC. A/K/A BARR PHARMACEUTICALS LLC** ("Barr").

7.     Defendant **PLIVA, INC.** ("Pliva") is subject to the jurisdiction and venue of this Court.

8.     Defendant **BARR** is a Delaware and New Jersey corporation with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677, and regularly conducts business in Kentucky.  Barr is being sued herein as the owner of Pliva.

9.     Defendant **BARR** is subject to the jurisdiction and venue of this Court**.**

10.     PLIVA and Barr identified *supra*, inclusive, may be referred to collectively as the "Generic Defendants."  Generic Defendants were engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing, promoting and/or selling, either directly or indirectly, through third parties, as successor in interest, or other related entities Reglan/MCP in

Kentucky.

11.    At all times relevant hereto, the Defendants were acting by and through their agents, servants and/or employees, each of whom were acting within the scope and course of their employment, by agency or authority.

## VENUE AND JURISDICTION

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between the Plaintiff and the Defendants.

13.    Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claim occurred in this District, and because Defendants' conduct substantial business in this District.

14.    This Court has personal jurisdiction over the Defendants because they have done business in the Commonwealth of Kentucky, have committed a tort in whole or in part in the Commonwealth of Kentucky, have substantial and continuing contact with the Commonwealth of Kentucky, and derive substantial revenue from goods used and consumed within the Commonwealth of Kentucky.    The Defendants actively sell, market and promote its pharmaceutical product to physicians and consumers in this state on a regular and consistent basis.

15.    At all times relevant hereto, Generic Defendants were engaged in the business of developing, manufacturing, labeling, distributing, promoting and/or selling, either directly or indirectly, through third parties, as successor in interest, or other related entities, Reglan/MCP in the Western District of Kentucky and in interstate commerce, for which they each derived significant and regular income.

## FACTS GIVING RISE TO CLAIMS

**A.      REGLAN/METOCLOPRAMIDE BACKGROUND**

16.      At all relevant times up to approximately the end of 2001, Wyeth (as the A.H. Robins Company and/or American Home Products Corporation and/or by some other name) marketed and manufactured and/or distributed a certain name brand prescription drug product known as Reglan.

17.      At all relevant times between approximately the end of 2001 and up to approximately March 2008, Schwarz marketed and manufactured and/or distributed the prescription drug product known as Reglan.

18.      Generic Defendants began manufacturing and selling Reglan/MCP in or around 1982.  More than a dozen generic manufacturers have manufactured Reglan/MCP over the past eighteen years. While each Generic Defendant was under a duty to produce a bioequivalent version of MCP, each Generic Defendant engaged in designing, sourcing, manufacturing and selling its own unique formulation of MCP.

19.      The generic metoclopramide products contain the same active ingredient (i.e., drug substance) as brand name Reglan, and are equivalent to brand name Reglan products in dosage, strength, and all other therapeutically material respects, including potentially beneficial effects and potentially harmful side effects, and differ from brand name Reglan only in therapeutically non-relevant respects such as color, shape, inactive ingredients, and source of manufacture.

20.      The term "Reglan" is the brand name for a drug known generically as metoclopramide, or metoclopramide hydrochloride or metoclopramide HCl, terms which also refer to the drug substance that is the sole active ingredient in Reglan.

21.     Reglan/MCP is a prescription medication classified as a GI stimulant, antiemetic and Dopaminergic blocking agent. It is indicated for short-term therapy for symptomatic gastroesophageal reflux and acute and recurrent diabetic gastric stasis.

22.     The active ingredient, Metoclopramide and Metoclopramide HCl, is a dopamine receptor blocking drug.  As Metoclopramide blocks dopamine transfer in the brain, it causes the brain to react and to produce more dopamine receptors so that areas controlling movement become hypersensitive to dopamine, in effect to overreact.

23.     Reglan/MCP is indicated for treatment use of no greater than twelve (12) weeks; however, Defendants represented that Reglan/MCP was safe for use to treat nausea and or esophageal reflux for durations that exceeded twelve (12) weeks.

24.     The "indications" (recommended uses) listed in the product labeling for Reglan/MCP include adult short-term therapy of symptomatic gastroesophageal reflux and acute and recurrent diabetic gastric stasis.

25.     The "indications" (recommended uses) listed in the product labeling for Reglan/MCP specified therapy for up to twelve (12) weeks in adults, for gastroesophageal reflux and specified no durational limit in therapy for gastric stasis or gastroparesis.

26.     At no time has Reglan/MCP been shown to be either efficacious or safe when used for long-term (longer than twelve weeks) treatment.

27.     Patients who use Reglan/MCP for long periods (exceeding twelve weeks) are at a significant and unreasonably dangerous increased risk of developing a severe and permanent neurological movement disorder, known as tardive dyskinesia, dystonia and/or tremors.

28.     Other serious side effects that may be caused by ingesting Reglan/MCP for longer periods of time include, but are not limited to, central nervous system disorders, depression with

suicidal ideation, akathisia, tardive dyskinesia, tardive dystonia, tremors, visual disturbances and interference with drug metabolism.

29.     Patients who use Reglan/MCP for long periods (greater than 12 weeks) who are not able to effectively metabolize it are at a greater risk of developing these serious and permanent injuries.

30.     Tardive Dyskinesia, Dystonia and tremors are serious side effects associated with the ingestion of Reglan/MCP and are debilitating neurological disorders that often result in involuntary and uncontrollable movements of the head, neck, face, arms, legs and/or trunk, as well as, involuntary facial grimacing and tongue movements, including tongue thrusting, tongue chewing and/or other involuntary movements.

31.     There is no known cure for Tardive Dyskinesia, Dystonia, Stereotypy, Tremors or Akathisia.

32.     Reglan/MCP can also cause aggravation in preexisting conditions and, in particular, is known to mask the symptoms of Tardive Dyskinesia while usage continues.

33.     The link between neuroleptic drugs, such as Reglan/MCP, and involuntary movements has been known from as far back as 1973.[1]  Between 1973 and present day, dozens upon dozens of studies have specifically evidenced the direct connection between the long term, pediatric and/or short term use of Reglan/MCP and involuntary movement disorders.

34.     Wyeth, in particular, has known about the link between long-term usage (over 12 weeks) since at least 1982, when an AHR representative, Samuel A. Tisdale, M.D., wrote a response to a physician's questions about Reglan that "[t]he only caveat about long-term use is the appearance in the literature of several cases of tardive dyskinesia … [t]his adverse effect would be the limiting factor on how long a drug of this class should be given."

---

[1] Crane GE (September 1973).  "Is tardive dyskinesia a drug effect?"  *Am J Psychiatry* 130(9); 1043-4.

**B. PLAINTIFF DEVELOPED TARDIVE DYSKINESIA AND OROLINGUAL FACIAL BUCCAL STEREOTYPY AS A RESULT OF INGESTING REGLAN/ METOCLOPRAMIDE**

35.     Plaintiff brings this action for the purpose of recovering damages for the personal injuries and emotional distress she has suffered as a result of ingesting Reglan/MCP.

36.     In or around November 2006 through December 2007, Ms. Nicely ingested 30-40 mg of Reglan/MCP per day to treat gastroparesis, as prescribed by her physician.  During this period, Ms. Nicely ingested high-doses of Reglan/MCP for more than one year.

37.     The Reglan/MCP Ms. Nicely ingested was manufactured by Pliva, which was owned by Barr and Teva.

38.     During the time that Ms. Nicely used Reglan/MCP and continuing through the present, she experienced tremors, involuntary movements of her mouth, tongue, jaw and eyes and anxiety.

39.     Ms. Nicely sought treatment from her primary care physician, Dr. Arvin, on or about December 2007.  Ms. Nicely presented with weakness, clumsiness, and intermittent tremors.

40.     On or about December 2007, pursuant to the direction of her physicians, Ms. Nicely discontinued her Reglan/MCP use.  At or around this time, January 2008, she was also diagnosed with tardive dyskinesia secondary to Reglan/MCP.

41.     Ms. Nicely continued to seek treatment for her tardive dyskinesia with neurologist, Dr. Picon. In or around January 2010, Dr. Picon confirmed her diagnosis of Tardive Dyskinesia and more specifically diagnosed her with Oral Dyskinesia secondary to Reglan/MCP.

42.     Tardive Dyskinesia ("TD"), one of the serious side effects associated with the ingestion of Reglan/MCP, is characterized by involuntary, repetitive movements of the

extremities, or lip smacking, grimacing, tongue protrusion, rapid eye movements or blinking, puckering and pursing of the lips, or impaired movement of the fingers. These symptoms are rarely reversible and there is no known treatment for TD. Significant psychosocial morbidity, decreased quality of life, and even mortality have been attributed to TD.

43.     A dyskinesia is a movement disorder, which consists of diminished voluntary movements and the presence of involuntary movements found in patients with TD. Oral Dyskinesia is involuntary, repeated, rhythmic purposeless movements of the muscles of the lower face, lips, and tongue

44.     Ms. Nicely's TD, and specifically Oral Dyskinesia, has resulted in her experiencing persistent, involuntary movements of her mouth, jaw and tongue, embarrassment and difficulty with essential activities of daily living including eating, swallowing and speaking.

45.     Ms. Nicely has sought, and continues to seek, treatment for her Reglan/MCP induced injuries from a movement disorder specialist.

46.     Upon information and belief, Ms. Nicely's TD, and specifically Oral Dyskinesia, has been linked to her use of Reglan/MCP.

47.     At no time, prior to her diagnosis of Reglan/MCP induced TD was Ms. Nicely knowledgeable or informed of the dangerous side effects associated with prolonged exposure to Reglan/MCP.

48.     At no time prior to mid-2009, was Ms. Nicely aware that she was wronged by one or more of the Defendants, nor which Defendant(s) committed the wrongs that caused her TD.

49.     Upon information and belief, while some symptoms of Ms. Nicely's tardive dyskinesia, a severe and often permanent, painful, disfiguring and debilitating neurological movement disorder, caused by the ingestion of Reglan/MCP, have improved slightly over time,

her injuries are likely permanent.

50.     Presently, there is no cure for the TD and Oral Dyskinesia, from which Ms. Nicely suffers.

51.     Upon information and belief, in prescribing the Reglan/MCP to the Plaintiff long-term and/or at high doses, their prescribing doctors relied upon information published in the package inserts and/or the Physicians' Desk Reference (hereinafter referred to as "PDR") or otherwise disseminated by the Reference Listed Drug Company (hereinafter referred to as "RLD") and/or the New Drug Application Holder (hereinafter referred to as "NDA Holder").

52.     Upon information and belief, in prescribing the Reglan/MCP to the Plaintiff long-

71.     Under the FDA's generic drug schema, generic manufacturers may submit an Abbreviated New Drug Application to the FDA.  The ANDA process is intended to streamline the drug approval process for generic medications whose brand-name counterparts have already conducted clinical trials and testing.

72.     In 1984, Congress passed an amendment to the Food, Drug, and Cosmetic Act ("FDCA") known as the "Hatch-Waxman" Act to allow a generic manufacturer to get an approved ANDA by showing bioequivalence to the Reference-Listed Drug ("RLD").  Hatch-Waxman similarly requires the generic drug's labeling to be identical to the RLD holder's labeling of the bioequivalent product.

73.     Because of these processes, generic drugs are required to have identical labels as their brand-name counterparts.

74.     The Physician's Desk Reference ("PDR") is published annually, and relied upon by physicians and healthcare practitioners.  The PDR includes the FDA-approved labeling for all approved drugs on the market.

75. Plaintiff's physician was not aware of information different from or contrary to the inaccurate, misleading, materially incomplete, false and/or otherwise inadequate information disseminated in the PDR and/or the package insert.

76. Plaintiff ingested the Reglan/MCP as prescribed. Plaintiff also used the pharmaceutical drugs Reglan/MCP without substantial change in the condition of the drugs between the time of design and manufacture of the drugs and the time the drugs were used as directed.

77. Prior to ingesting Reglan/MCP, Plaintiff never experienced the abnormal, involuntary movements, TD or any form of stereotypy, which Plaintiff developed post-ingestion of Reglan/MCP.

78. Plaintiff was not aware of information different from or contrary to the inaccurate, misleading, materially incomplete, false and/or otherwise inadequate information disseminated in the PDR, RLD, by the NDA Holders, brand name manufacturers or Generic Defendants.

79. During the time of her ingestion of Reglan/MCP, Plaintiff remained at all times unaware of the potential risks, side effects and/or relationship between the continued ingestion of Reglan/MCP as prescribed and the physical symptoms that they were developing.

80. Had Plaintiff known of the risks associated with long-term ingestion of Reglan/MCP, she would not have taken the drug.

81. Plaintiff's ingestion of Reglan/MCP, as prescribed, resulted in unnecessary and unreasonably dangerous overexposure to the drug. Use of Reglan/MCP caused Plaintiff to suffer serious, permanent and disabling injuries including but not limited to injuries of or associated with the central nervous and extrapyramidal motor systems. Because of the injuries Plaintiff suffered from the use of Reglan/MCP, Plaintiff has experienced and will continue to experience

medical and related expenses, loss of ability to provide household services, disfigurement, disability, pain and suffering, psychological injury and other injuries and damages.

82.     Plaintiff's serious and permanent injuries, as described above, came about as a foreseeable and proximate result of dissemination of inaccurate, misleading, materially incomplete, false, and otherwise inadequate information concerning the potential effects of exposure to Reglan/MCP and the ingestion of Reglan/MCP to the medical community, physicians, Plaintiff's physicians, Plaintiff and other foreseeable users of the drug.

83.     Reglan/MCP was not approved by the United States Food and Drug Administration for long-term use or for use longer than 12 weeks.

84.     Because of the misleading information that the Defendants provided to physicians, consumers and the FDA about the true risks associated with the use of Reglan/MCP and because of the failure of the Defendants and each of them to adequately inform physicians generally, including Plaintiff's physician and pharmacists, about the true risks associated with the use of Reglan/MCP, at all times relevant to this lawsuit, while Plaintiff was taking Reglan/MCP, her physicians never informed her of the true risks of the involuntary movement disorders associated with Reglan/MCP or that Reglan/MCP was only approved for short term use (up to 12 weeks).

85.     At all times material hereto, Defendants knew or should have known of the serious side effects caused by Reglan/MCP including, but not limited to, central nervous system disorders, depression with suicidal ideation, akathisia, tardive dyskinesia, tardive dystonia, stereotypy, tremors, visual disturbances and interference with drug metabolism.

86.     As a result of the misrepresentations, breach of express and implied warranties and/or negligence of the Defendants, Plaintiff was prescribed excessive amounts of Reglan/MCP which caused her to suffer serious and permanent injuries as described above.

87.     As a result of the foregoing acts and omissions, Plaintiff requires and will require health care and services, and has incurred and will continue to incur medical and related expenses.  Plaintiff has suffered and will continue to suffer indirect costs, including diminished quality of life; and direct medical costs for follow-up care, including hospitalizations, treatment and other medical care.

88.     The product labeling and/or warnings for Reglan/MCP products have been strengthened, revised and clarified several times.

89.     In 1985, the label for Reglan/MCP warned that "tardive dyskinesia … may develop in patients treated with metoclopramide" without further explanation regarding the known links between long-term usage (more than 12 weeks) and Tardive Dyskinesia.

90.     In 1985, the package insert that accompanied Reglan/MCP was strengthened to warn that "[t]herapy longer than 12 weeks has not been evaluated and cannot be recommended" without further explanation regarding the known links between long-term usage (more than 12 weeks) and Tardive Dyskinesia.

91.     In 2004, the NDA holder of Reglan tablets, Schwarz Pharma, proposed a change to the Reglan/MCP label to include that "[t]herapy should not exceed 12 weeks in duration" without further explanation regarding the known links between long-term usage (more than 12 weeks) and Tardive Dyskinesia.

92.     The FDA adopted this change and the Reglan/MCP label in 2004 was strengthened to include "[t]herapy should not exceed 12 weeks in duration."

93.     Numerous generic manufacturers failed to update their Reglan/MCP products' labeling and package inserts to include the 1985 FDA-approved revisions.

94.     In 1985, generic manufacturers who failed to update their Reglan/MCP products' labeling and product revisions violated federal law because their Reglan/MCP labels were not the same as brand Reglan labels.

95.     Numerous generic manufacturers also failed to update their Reglan/MCP products' labeling with the 2004 FDA-approved label revision that added that "[t]herapy should not exceed 12 weeks in duration."

96.     Generic manufacturers who failed to update their Reglan/MCP products' labeling to conform to the 2004 FDA-approved label violated federal law because their Reglan/MCP labels were not the same as brand Reglan labels.

97.     Defendants who failed to update and/or modify their Reglan/MCP product labeling and/or drug information to include the 1985 and/or 2004 FDA-required label revisions mislead physicians, patients and the healthcare community to believe that Reglan/MCP was safe for long-term (longer than twelve weeks) treatment.

98.     Recognizing the true risk of long-term usage of Reglan/MCP and tardive dyskinesia, in February 2009 the United States Food and Drug Administration (hereinafter referred to as "FDA") issued an advisory requiring the addition of a **Boxed Warning** for Reglan/MCP.  This new warning, appearing at the top of the label, states that "Chronic treatment with Metoclopramide can cause tardive dyskinesia, a serious movement disorder that is often irreversible . . . ."  Additionally, the new Boxed Warning now tells physicians and patients that "Prolonged treatment (greater than 12 weeks) with Metoclopramide should be avoided in all but rare cases . . . ."

99.     Finally, the FDA is now requiring that Defendants implement a Risk Evaluation and Mitigation Strategy because the FDA has determined that the use of Reglan/MCP "pose[s] a serious and significant public health concern requiring the distribution of a Medication Guide." This Medication Guide, setting out all the risks of the drug and to be given to all users "is necessary for the patients' safe use of Reglan (Metoclopramide) . . . ." Unfortunately, upon information and belief, neither this Boxed Warning nor the Medication Guide was available to the Plaintiff when she ingested Reglan/MCP.

100.     Despite Reglan/MCP's long history of label changes and revisions up until the FDA's 2009 Black Box requirement, after 2002, no product labeling information or other labeling information about the drug was published to physicians or the medical community, in the *Physicians' Desk Reference* or otherwise, by any Brand or Generic Defendant, or other manufacturers. Warning information added to the product labeling in 1985 and in 2004 was never distributed to physicians nor the medical community, and therefore, these revisions are generally not known to physicians or their patients.

101.     All Defendants failed to inform the medical community of the 2004 label revision that added that therapy with Reglan/MCP should not exceed 12 weeks in duration. No Defendant even attempted to inform the medical community, their customers, or their intended consumers like the Plaintiff, of the 2004 FDA-mandated label revision limiting recommended duration of treatment with Reglan/MCP to 12 weeks.

102.     Plaintiff's serious and permanent injuries, as described above, came about as a foreseeable and proximate result of Defendants' dissemination of inaccurate, misleading, materially incomplete, false and otherwise inadequate information concerning the potential

effects of exposure to and long-term ingestion of Reglan/MCP to the medical community, Plaintiff, and other foreseeable users of the drug.

103.     Plaintiff's serious and permanent injuries, as described above, came about due to Defendants' failure to update their Reglan/MCP labeling and drug information to conform to the FDA-approved and mandated label revisions in 1985 and/or 2004.

104.     Plaintiff has experienced and will continue to experience medical and related expenses, loss of ability to provide household services, disfigurement, disability, pain, suffering, diminished quality of life, psychological injury, lost wages and earning capacity, and/or other injuries and damages due to the prescription and ingestion of Reglan/MCP.

## C.     DEFENDANTS' WRONGFUL CONDUCT

105.     This case involves Defendants' failure to warn doctors and patients of information within their knowledge or possession which indicated that Reglan/MCP, when taken for long periods of time, caused serious, permanent and debilitating side effects, including the injuries suffered by the Plaintiff.   By failing to update their drug information, including their labels, package inserts, drug databases, distributed to doctors and patients alike, Defendants inaccurately warned of true risks of Reglan/MCP and misrepresented the safety of the drug for long-term usage.   All Defendants were required to update their Reglan/MCP information by law and knowingly and consciously failed to do so for the sake of profit.

106.     Defendants' failed to warn doctors, patients, including the Plaintiff, and the healthcare community of the true risks presented by use of Reglan/MCP by failing to update their Reglan/MCP product labeling and/or drug information to conform with the FDA-approved labeling, which was required under the law.

107.    Defendants jointly and severally marketed, manufactured and distributed Reglan/MCP and/or encouraged the long-term use of these drugs, misrepresented the effectiveness of these drugs and concealed the drug's dangerous side effects.

108.    By failing to update the labeling, package inserts, and/or drug information with the 1985 and/or 2004 FDA-mandated label revisions, all Defendants misled physicians, patients and the healthcare community to believe use of Reglan/MCP was safe for long term (longer then twelve weeks) treatment.

109.    Generic Defendants submitted Abbreviated New Drug Applications ("ANDA") to the FDA, based on representations made by the RLD companies, requesting permission to manufacture, market, and distribute generic Metoclopramide and/or Metoclopramide HCl.

110.    Under the ANDA process, the Code of Federal Regulations *required* Generic Defendants to submit labels for Metoclopramide and/or Metoclopramide HCl initially identical in all material aspects to the reference listed drug label.

111.    By failing to update their Reglan/MCP products' labeling with the 1985 and/or 2004 label revisions mandated by the FDA, Generic Defendants violated the "sameness" requirement under the "Hatch-Waxman" Act.

112.    By failing to update their Reglan/MCP products' labeling with the 1985 and/or 2004 label revisions mandated by the FDA, Generic Defendants failed to adequately warn consumers and physicians of the true risks of Reglan/MCP and misled them to believe their Reglan/MCP products were safe for long-term (longer than twelve weeks) ingestion.

113.    Under the Code of Federal Regulations, Generic Defendants had a duty to ensure its Reglan/MCP warnings to the medical community were accurate and adequate, to conduct post

market safety surveillance, to review all adverse drug event information, and to report any information bearing on the risk and/or prevalence of side effects caused by Reglan/MCP.

114.    Under the Code of Federal Regulations, if a Generic Defendant discovers information in the course of the fulfillment of its duties as outlined above, it must report that information to the FDA, and to the medical community, Plaintiff and other foreseeable users of Reglan/MCP to ensure that its warnings are continually accurate and adequate.

115.    Under the Code of Federal Regulations, if a Generic Defendant's product undergoes a label change as indicated by the brand manufacturer's equivalent product's label change, Generic Defendants may use multiple methods to update their product's labeling, including the "changes-being-effected" process or by sending out "Dear Healthcare Professional" letters to inform the medical community of a label update.

116.    Generic Defendants failed to use the "changes-being-effected" process to appropriately conform its Reglan/MCP labeling to the 1985 and/or 2004 updated approved labeling for the brand name drug.

117.    Generic Defendants failed to distribute "Dear Doctor" letters to inform the medical community at large of its Reglan/MCP products' label changes in 1985 and/or 2004.

118.    Generic Defendants failed to communicate in any manner the 1985 and/or 2004 label changes to Reglan/MCP to the medical community, in a manner consistent with and not contrary to the updated labeling.

119.    In designing their bioequivalent version of Reglan and deciding to enter the marketplace, Generic Defendants failed to investigate the accuracy of their Metoclopramide and/or Metoclopramide HCl drug labels.

120. In designing their bioequivalent version of Reglan and deciding to enter the marketplace, Generic Defendants failed to review the medical and scientific literature for the Metoclopramide drug and/or Metoclopramide HCl drug.

121. In designing their bioequivalent version of Reglan and deciding to enter the marketplace, Generic Defendants failed to fulfill their duties of pharmacovigilance before and after approval of their respective ANDAs for the Metoclopramide drug and/or Metoclopramide HCl drug.

122. In designing their bioequivalent version of Reglan and deciding to enter the marketplace, Generic Defendants relied upon the name brand manufacturer and the referenced listed drug companies to review the aforementioned medical and scientific literature for Reglan/MCP.

123. Under the FDA schema, if the FDA approves a label change as requested by an ANDA holder, the NDA holder (also referred to as the RLD Company) must also amend its label and vice versa.

124. Generic Defendants failed to communicate the true and accurate risks and/or prevalence of severe neurological side effects resulting from the ingestion of drugs containing Metoclopramide and/or Metoclopramide HCl.

125. Generic Defendants disseminated to physicians, through package inserts, the publication of the PDR, patient education monographs, and otherwise, information concerning the properties and effects of Reglan/MCP, with the intention that physicians would rely upon that information in their decisions concerning the prescription of drug therapy for their patients, including the Plaintiff.

126.     Defendants knew, or should have known through the exercise of reasonable care, that the PDR, package insert, information publically available, drug database and module drug information for Reglan/MCP substantially understated the prevalence of acute and long-term side effects of ingesting the drug.

127.     Defendants failed to use reasonable care to modify the PDR, package insert, information publically available, drug database and module drug information to adequately warn patients and physicians about the true risks of both short-term and long-term use, even after several injured patients filed lawsuits alleging inadequate warnings and produced competent expert testimony supporting their allegations.

128.     Defendants failed to update and/or revise their product labeling and/or drug information to include the 1985, 2004 and/or 2009 FDA-mandated label changes to Reglan/MCP, thereby inadequately warning of the true risks of Reglan/MCP and misleading physicians, patients, and the healthcare community to believe treatment with Reglan/MCP was safe for twelve (12) weeks or longer.

129.     Defendants owed a duty in all of their several undertakings, including the dissemination of information concerning Reglan/MCP, to exercise reasonable care to ensure that they provided accurate information about risks and benefits.

130.     Defendants failed to conduct and report post market safety surveillance on Reglan/MCP.

131.    Defendants failed to review all adverse drug event information[2] and to report any information bearing upon the adequacy and accuracy of their warnings, efficacy, or safety, including the risks and/or prevalence of side effects caused by Reglan/MCP.

132.    Defendants failed to monitor all relevant scientific literature related to Reglan/MCP.

133.    Defendants failed to conduct appropriate safety and efficacy studies in a timely manner to support marketed risks and benefits of Reglan/MCP.

134.    Defendants failed to disclose material safety information regarding the serious and permanent side effects caused by taking Reglan/MCP for long periods of time.

135.    Defendants failed to report data, regardless of the degree of significance, regarding the adequacy and/or accuracy of their warnings, efficacy or safety of Reglan/MCP.

136.    Defendants knowingly concealed from patients and physicians material facts bearing on the interpretation of package insert disclosures, that exposure to Reglan/MCP can lead to tardive dyskinesia, dystonia, tremors and other extrapyramidal side effects, that the risk is "believed" to increase with duration of therapy and total cumulative dose, and that therapy for longer than 12 weeks "cannot be recommended."

137.    Defendants concealed the fact that earlier false information disseminated by A.H. Robins Company and/or Wyeth representing long-term Reglan/MCP therapy to be reasonably safe, was unscientific and false.

138.    Defendants concealed the fact that Reglan/MCP is a neuroleptic agent and dopamine antagonist, which can be expected to lead to tardive dyskinesia, dystonia, tremors and other extrapyramidal side effects with approximately the same high frequency, particularly in

_____

[2] Defendants are required to review all adverse drug experience information obtained or otherwise received . . . from any source…including derived from postmarketing clinical investigations, postmarketing epidemiological/ surveillance studies, reports from the scientific literature, and unpublished scientific reports.  21 C.F.R. § 317.80(b).

longer term use, as other neuroleptic drugs and that epidemiological studies have consistently confirmed this expectation.

139. Defendants also concealed the fact that the treatment of chronic or intermittent gastroesophageal reflux and/or diabetic gastroparesis and/or other gastric disorders with Reglan/MCP for longer than 12 weeks is unlikely to be reasonably safe.

140. Some or all of the Defendants, as a result of their participation as defendants in previous litigation concerning Reglan/MCP products received clear notice of Wyeth's suppression of important safety information concerning Reglan/MCP, yet despite this notice chose to ignore the information and join consciously in the suppression.

141. As a result of all of the Defendants wrongful conduct, Plaintiff suffered and continues to suffer, significant, permanent injuries.


## COUNT I

## NEGLIGENCE, NEGLIGENT MISREPRESENTATION AND NEGLIGENT SUPPLY OF INFORMATION FOR THE GUIDANCE OF OTHERS (GENERIC DEFENDANTS)

142. Plaintiff incorporates by reference all of the above paragraphs.

143. Generic Defendants specialize in the design, development, manufacture and sale of generic pharmaceuticals, including Reglan/MCP.

144. Generic Defendants, during all times material hereto, have regularly conducted business and supplied pharmaceutical medications, including but not limited to generic Reglan/MCP.

145.     By way of information and belief Plaintiff ingested Reglan/MCP that was designed, formulated, manufactured and sold by the Generic Defendants during the time period in question.

146.     Based upon information and belief Generic Defendants submitted Abbreviated New Drug Applications (ANDA) to the FDA, based on representations made by the RLD companies, requesting permission to manufacture, market and distribute generic Reglan/MCP.

147.     Under the ANDA process, the Code of Federal Regulations required Generic Defendants to submit labels for Reglan/MCP initially identical in all material aspects to the reference listed drug label.

148.     Under the Code of Federal Regulations, Generic Defendants had a duty to ensure that Reglan/MCP warnings to the medical community were accurate and adequate, and to conduct post market safety surveillance, to review all adverse drug event information (ADE) and to report any information bearing on the risk and/or prevalence of side effects caused by Reglan/MCP.

149.     Under the Code of Federal Regulations if a generic drug manufacturer discovers subsequent information in the course of the fulfillment of their duties as outlined above, they are obligated to report that information to the medical community, and thereby Plaintiff's physician, so that the Plaintiff and other foreseeable users of Reglan/MCP are apprised of warnings and updates that are accurate and adequate.

150.     Under the Code of Federal Regulations a generic drug manufacturer may inform the medical community of warnings and updates to their generic products through the "changes-being-effected" process or through the dissemination of "Dear Healthcare Professional" letters, which are consistent with, and not contrary to, the drug's approved labeling.

151.    Despite these requirements, Generic Defendants failed to investigate the accuracy of its generic bioequivalent Metoclopramide and/or Metoclopramide HCL drug label. As a direct result, Plaintiff's prescribing physician prescribed Reglan/MCP in a manner that he/she would not have, had the physician known of the significant risks of, *inter alia*, Tardive Dyskinesia, Dystonia, Tremors and Akathisia.

152.    Despite these requirements, Generic Defendants failed to update and/or revise their labels for their Reglan/MCP products with the 1985, 2004, and/or 2009 FDA-mandated label revisions, thereby failing to adequately warn of the true risks of the use of Reglan/MCP and misleading physicians, patients and the healthcare community to believe long term use of Reglan/MCP (longer than twelve weeks) was safe.

153.    Despite these requirements, Generic Defendants failed to employ the "changes-being-effected" process or to disseminate "Dear Healthcare Professional" letters to communicate important and strengthened FDA-approved label changes to their Reglan/MCP products.

154.    Generic Defendants unreasonably failed to review and act upon the medical literature for their Reglan/MCP and instead relied upon the name brand manufacturer and the RLD to review the aforementioned medical literature and thus failed to communicate the true and accurate risks and/or prevalence of severe neurological side effects resulting from the ingestion of drugs containing Reglan/MCP. As a result, Plaintiff came to rely upon the safety and soundness of said drug, and so failed to appreciate or have knowledge of the risk associated with long-term ingestion of the drug.

155.    Generic Defendants were negligent and breached duties owed to the Plaintiff as a user and consumer with respect to the manufacture and sale of Reglan/MCP, as set forth otherwise herein and for reasons including, but not limited to the following:

a)    Failing to reasonably design, manufacture, test, inspect, market, sell and/or distribute, Reglan/MCP so as to avoid the aforementioned risks to individuals;

b)    Failing to reasonably accompany the drug with adequate warnings, instructions and updates regarding the adverse and permanent side effects including death (particularly with foreseeable long term use), despite Generic Defendants' knowledge of the defects and risks associated with Reglan/MCP ingestion and despite the FDA-required revisions to the Reglan/MCP label in 1985, 2004 and 2009;

c)    Failing to reasonably and accurately represent to the prescribing physician(s) and ultimately thereby users and consumers, that the drug can cause central nervous system side effects and significant and permanent extra pyramidal symptoms, particularly with foreseeable long term use;

d)    Failing to conduct adequate post marketing surveillance to determine the safety of Reglan/MCP, and failing to monitor all relevant scientific literature related to Reglan/MCP;

e)    Failing to adequately and reasonably inform the medical community that Reglan/MCP was unreasonably dangerous for long-term use, despite having knowledge, through their own studies and/or studies by independent investigators, that physicians frequently prescribed Reglan/MCP for long-term use;

f)    Failing to reasonably and sufficiently disclose information in package inserts for Reglan/MCP or through the Physician's Desk Reference (PDR), of the risks of Tardive Dyskinesia, Dystonia, Tremors and other extra pyramidal side effects   of Reglan/MCP, including, but not limited to the increased risks for patients who receive the drug for 12 weeks or longer;

g)    Failing to reasonably and promptly correct and/or amend the package inserts, PDR monographs, and literature regarding the risks of long term ingestion of Reglan/MCP, once the side effects became actually or constructively known; with the knowledge that this information would be disseminated to physicians who would rely upon that information in their decisions concerning the prescription of drug therapy for their patients;

h)    Failing to reasonably and properly conduct and report adequate post-marking surveillance and testing to determine the safety of the product, particularly with foreseeable long-term use, despite Generic Defendants' knowledge of the defects and risks associated with Reglan/MCP ingestion;

i)     Failing to reasonably and adequately warn that the long term use of Reglan/MCP may result in side effects such as Depression with Suicidal Ideation, Akathisia, Akinesia, Tardive Dyskinesia, Tardive Dystonia, Tremors, Stereotypy, Visual Disturbances, etc., and that these side effects were permanent in nature;

j)     Willfully and deliberately failing to adequately disclose all actually and/or constructively known risks regarding Reglan/MCP and in doing so, acting with a conscious disregard of Plaintiff's safety and/or welfare, and others similarly situated.

156.    The negligence described above directly and proximately caused Plaintiff severe and permanent injuries, in that it directly and in natural and continuous sequence produced and contributed substantially thereto, including but not limited to the fact that Plaintiff's prescribing physician prescribed Reglan/MCP in a manner that he/she would not have, had the physician known of the significant risks of, *inter alia*, Tardive Dyskinesia, Dystonia, Tremors, Stereotypy and Akathisia.

157.    The Generic Defendants breached their duties, and proximately caused through a defective product and/or through their acts of negligence, severe and permanent damage to the Plaintiff.

158.    Generic Defendants are therefore liable for intentional, reckless, and/or negligent omission, concealment and failure to warn of the design and manufacturing defects which caused the Plaintiff to suffer injury, harm and economic loss, including medical bills, medical expenses, and including permanent and substantial physical disability.

159.    As a direct and proximate result of the acts and omissions of the Generic Defendants, Plaintiff ingested Reglan/MCP as prescribed and which unbeknownst to her was causally related to and substantially contributed to her development of a permanent neurological disorder.

**COUNT II**

## BREACH OF WARRANTY
## (GENERIC DEFENDANTS)

160.    Plaintiff incorporates by reference all of the above paragraphs.

161.    Through promotional statement(s) and product literature Generic Defendants expressly warranted to the medical community and thereby ultimately the user/consumer (Plaintiff) that Reglan/MCP was safe and capable of treating gastrointestinal disorders over an extended period of time (i.e. over 12 weeks), despite Generic Defendants' knowledge to the contrary.

162.    These Defendants knew or should have known that their warranties regarding safety for long-term use would be relied upon by the medical community which included ordinary, reasonable and prudent physicians who would share that information with others in the medical community and that eventually prescribiång physicians and the public (including Plaintiff) would come to rely and did rely upon Generic Defendants' express warranties about Reglan/MCP's safety for long-term use.

163.    Generic Defendants' express warranties about the safety of Reglan/MCP for long-term use were false and intentionally misleading.

164.    Despite knowledge to the contrary, Generic Defendants continued to promote, sell and market the safety of Reglan/MCP, while having knowledge of the design, manufacturing, safety defects and risk that it posed to the user/consumer of developing severe neurological side effects such as Tardive Dyskinesia, Dystonia, Stereotypy, Tremors and Akathisia with prolonged use of the drug.

165.    Generic Defendants, through their marketing, promoting, selling and distribution of Reglan/MCP represented that the drug product was of merchantable quality and safe and fit for its intended use of treating gastrointestinal symptoms such as gastroesophageal reflux and

gastroparesis. At the same time, Generic Defendants continued to conceal and fail to warn of the risks and side effects of neurological disorders such as Tardive Dyskinesia, Dystonia, Tremors, Stereotypy and Akathisia which were associated with long-term use of Reglan/MCP, and continued to impliedly warrant the medical soundness of the drug to the medical community and thereby general public. As a direct result, Plaintiff's prescribing physician prescribed Reglan/MCP in a manner that he/she would not have, had the physicians known of the significant risks of, inter *alia*, Tardive Dyskinesia, Dystonia, Tremors, Stereotypy and Akathisia.

166.    Plaintiff and her prescribing physician reasonably relied on the presumption that the Generic Defendants would provide notice, disclosure or warnings of any serious risks associated with Reglan/MCP's merchantability, quality, safety and fitness for its intended use.

167.    Contrary to such implied warranties, Reglan/MCP was not of merchantable quality or safe or fit for its intended use, because the drugs were and are unreasonably dangerous and unfit for the ordinary, intended and foreseeable use due to the adverse side effects and inadequate warnings of serious health risks.

168.    As a direct and proximate result of the Generic Defendants' breach of warranty, Plaintiff ingested Reglan/MCP as prescribed and which unbeknownst to the Plaintiff was causally related to and substantially contributed to the development of a permanent neurological disorder.

169.    Plaintiff has duly given notice to the Generic Defendants of the breach of the above described warranties.

## COUNT III

## MISREPRESENTATION AND FRAUD
### (GENERIC DEFENDANTS)

170.    Plaintiff incorporates by reference all of the above paragraphs.

171.     Generic Defendants intentionally and negligently disseminated misleading information to physicians across the country, through the PDR, about the risks of long-term ingestion of Reglan/MCP and the increased risk of extrapyramidal side effects, including tardive dyskinesia and dystonia.

172.     Generic Defendants fraudulently concealed FDA-approved and required label revisions to Reglan/MCP products in 1985, 2004, and/or 2009, for the purpose of misleading and defrauding the public to increase and encourage long term use (longer than twelve weeks) of their Reglan/MCP products.

173.     Generic Defendants misrepresented the soundness and reliability of Reglan/MCP to physicians and the medical community and thereby ultimately the general public through promotional and marketing campaigns. They misrepresented that the drug was safe and effective when used as prescribed, when it fact, it was dangerous to the health of patients. Generic Defendants continued these misrepresentations for an extended period of time, without disclosing material information that was available to them. As a direct result, Plaintiff's prescribing physician prescribed Reglan/MCP in a manner that he/she would not have, had the physician known of the significant risks of, *inter alia*, Tardive Dyskinesia, Dystonia, Tremors, Stereotypy and Akathisia.

174.     Generic Defendants concealed the design, manufacturing and safety defects from the public by withholding information pertaining to the design, manufacturing, safety defects and risks of severe and permanent neurological side effects related to the ingestion and long-term use of Reglan/MCP, while knowingly presenting inaccurate safety and risk information to the medical community and thereby ultimately the general public, users/consumers, including Plaintiff.

175. Generic Defendants knew of the risks that Reglan/MCP presented to users/consumers when consumers like the Plaintiff unknowingly ingested the drug product as prescribed for periods exceeding 12 weeks in duration.

176. Generic Defendants failed to exercise reasonable care and competence in obtaining and/or communicating information regarding the safe use of Reglan/MCP and otherwise failed to exercise reasonable care in transmitting information to the medical community and thereby ultimately to the general public, users/consumers, including the Plaintiff.

177. Generic Defendants made these representations concerning Reglan/MCP in the course of its business as designer, manufacturer and distributor of the drug.

178. Such representations were made by the Generic Defendants with the intent to defraud and/or deceive the medical community and thereby ultimately the users/consumers of Reglan/MCP and with the knowledge and intent to induce reliance upon these representations and use of said drug product.

179. As a direct and proximate result of the acts and omissions of the Generic Defendants, Plaintiff ingested Reglan/MCP as prescribed and which unbeknownst to her was causally related to and substantially contributed to her development of a permanent neurological disorder. Plaintiff would not have suffered her injuries but for the above fraud, concealment, misrepresentations or omissions of the Generic Defendants.

180. In doing the acts alleged in this Petition, Generic Defendants acted with oppression, fraud, and malice, and Plaintiff is therefore entitled to punitive damages in an amount reasonably related to Plaintiff's actual damages and to Generic Defendants' wealth, and sufficiently large to be an example to others and to deter Generic Defendants, and others from engaging in similar conduct in the future.

## COUNT IV

## STRICT PRODUCT LIABILITY

181.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in this Petition with the same force and effect as if fully set forth herein.

182.    At all relevant times the Generic Defendants were engaged in the business of manufacturing, designing, marketing, promoting, distributing, and/or selling Reglan/MCP.

183.    At all times mentioned in this Complaint, Reglan/MCP was defective and/or unreasonably dangerous to Plaintiff and other foreseeable users at the time it left the control of the Generic Defendants.

184.    Reglan/MCP was "defective" and "unreasonably dangerous" when the product initially was patented, and subsequently when it was promoted and entered into the stream of commerce and was received by Plaintiff, in one or more of the following respects:

(a)    At the time Reglan/MCP left the control of the Generic Defendants it was defective and unreasonably dangerous due to a failure to contain adequate warnings or instructions, or, in the alternative, because it was designed in a defective manner, or, in the alternative, because the product breached an express warranty or failed to conform to other expressed factual representations upon which Plaintiff's physicians justifiably relied, or because it breached an implied warranty, all of which proximately caused the damages for which Plaintiff seek recovery herein.

(b)    Reglan/MCP was not reasonably safe as designed, taking into account the foreseeable risks involved in its use at the time the product left the possession of the Generic Defendants, and that such risks clearly outweighed the utility of the product or its therapeutic benefits.

(c)    At the time Reglan/MCP left the control of the Generic Defendants it possessed a dangerous characteristic that may cause damage and it was not reasonably safe due to inadequate or defective warnings or instructions that were known or reasonably scientifically knowable at the time the product left the possession of the Generic Defendants.  Specifically, although the Generic Defendants were well aware that Reglan/MCP could potentially cause central nervous system side effects, depression with suicidal ideation, akathisia, akinesia, tardive dyskinesia, tardive dystonia, tremors, stereotypy, visual disturbances and interference with the metabolism of other prescription drugs and in fact, had significantly greater prevalence and severity of these side effects in patients with diabetes mellitus,

warnings of such adverse health conditions were either not included on the package insert for these products or they were not adequate to inform reasonably prudent physicians and consumers. The Generic Defendants failed to use reasonable care to provide an adequate warning of these dangerous characteristics to handlers and users of Reglan/MCP.

(d)    The Generic Defendants' warnings or instructions were not of a nature that a reasonably prudent drug company in the same or similar circumstances would have provided with respect to the danger. There were no warnings or instructions that communicate sufficient information on the dangers and safe use of the product taking into account the characteristics of the product, and/or the ordinary knowledge common to the physician who prescribes and the consumer who purchases the product, such as the Plaintiff.

(e)    The metoclopramide manufactured and supplied by the Generic Defendants was further defective due to inadequate post-marketing warning or instruction because, after the Generic Defendants knew or should have known of the risks of injury from Reglan/MCP associated with long term use as commonly prescribed, they failed to promptly respond to and adequately warn about extrapyramidal side effects, among other adverse reactions.

185.    The Generic Defendants knew, or in light of reasonably available scientific knowledge should have known, about the danger that caused the injuries for which Plaintiff seeks recovery. A reasonably competent physician who prescribed metoclopramide and a reasonably competent Plaintiff who consumed metoclopramide would not realize its dangerous condition.

186.    The Generic Defendants knew or in light of reasonably available scientific knowledge should have known about the danger associated with use of Reglan/MCP that caused the damages for which Plaintiff seeks recovery.

187.    The reasonably foreseeable use of Reglan/MCP, involved substantial dangers not readily recognizable by the ordinary physician who prescribed Reglan/MCP or the patient, like Plaintiff, who consumed Reglan/MCP.

188.    The Generic Defendants knew that the Reglan/MCP was to be prescribed by physicians and used by consumers without inspection for defects in the product or in any of its components or ingredients and that Reglan/MCP was not properly prepared nor accompanied by

adequate warnings of its dangerous propensities that were known or reasonably scientifically knowable at the time of distribution.

189. Plaintiff and her physician did not know, nor had reason to know, at the time of the use of Reglan/MCP, or at any time prior to its use, of the existence of the above-described defects and inadequate warnings.

190. These defects caused serious injuries to Plaintiff when the product was used in its intended and foreseeable manner, and in the manner recommended by the Generic Defendants or in a non-intended manner that was reasonably foreseeable.

## COUNT V

## PUNITIVE DAMAGES

191. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in this Petition with the same force and effect as if fully set forth herein.

192. The conduct of each Defendant, as set forth herein above was intentional, willful, wanton, oppressive, malicious, and reckless, evidencing such an entire want of care as to raise the presumption of a conscious indifference to the consequences in that each Defendant acted only out of self-interest and personal gain. Such conduct evidences a specific intent to cause harm to Plaintiff as provided under Kentucky law.

193. Defendants are liable for punitive damages under Kentucky law.

## COUNT VI

## PLAINTIFF'S DAMAGES

194. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in this Petition with the same force and effect as if fully set forth herein.

195.     As a direct and proximate result of the aforesaid acts of and/or omissions by the

Defendants, Plaintiff has:

a)     suffered severe and permanent injuries, which the Plaintiff will be forced
to endure for the remainder of the Plaintiff's life;

b)     suffered physical impairment and disfigurement;

c)     suffered physical pain and suffering;

d)     increased risk of future harm;

e)     suffered mental pain and suffering;

f)     had the enjoyment of life severely impaired;

g)     incurred and will continue to incur lost wages and loss of earning capacity,

h)     incurred and will continue to incur various sums of money for past,
present and future medical expenses associated with monitoring and
treating the Plaintiff's injuries ;

i)     suffered a loss of consortium as to Plaintiff's spouse; and/or

j)     incurred attorney's fees and expenses of litigation related to this action.

**WHEREFORE,** Plaintiff demands judgment against the Defendants and requests that

this Honorable Court:

a)      enter a judgment against each Defendant, jointly and severally, for all
general and compensatory damages allowable to Plaintiff;

b)     enter a judgment against each Defendant, jointly and severally, for all
special damages allowable to Plaintiff;

c)     enters a judgment against each Defendant, jointly and severally, for all
other relief sought by Plaintiff under this Petition;

d)      order the costs of this action be cast upon Defendants; and

e)      grant Plaintiff such further relief which the Court deems just and
        appropriate.

**PLAINTIFF CLAIMS A TRIAL BY JURY.**


                                Respectfully submitted,

                                JONES WARD PLC
                                Jasper D. Ward IV


                                s/Jasper D. Ward IV_____
                                Marion E. Taylor Building
                                312 South Fourth Street, Sixth Floor
                                Louisville, Kentucky 40202
                                P: (502) 882-6000
                                F: (502) 587-2007
                                jasper@jonesward.com
                                Counsel for Plaintiff